**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

COLE STEWART

       Plaintiff,

vs.

THE CITY OF BOULDER, a Colorado municipality;
OFFICER NICHOLAS FRANKENREITER in his individual and official capacity;
OFFICER ANDREW KIRSHBAUM, in his individual and official capacity;
OFFICER ERIN STARKS, in his individual and official capacity;
OFFICER JACOB VAPORIS, in his individual and official capacity;
OFFICER RONALD PEREA, in his individual and official capacity;

       Defendants.

---

## **COMPLAINT AND JURY DEMAND**

Plaintiff by and through his attorney of record, respectfully allege for his Complaint as follows:

### **I.     Introduction**

1.     In the early morning hours of May 30, 2014, after an evening of drinking with friends, Mr. Cole Stewart took a cab to his apartment, where a dispute arose between him and the cab driver over a $4.85 cab fare. Instead of dropping Mr. Stewart off at his apartment, the driver took him against his will to a nearby police annex. When the cab stopped, Mr. Stewart exited the cab and ran toward his apartment. The cab driver's erratic driving and honking on his way to the location had alerted an officer at the police station. Boulder Police Officer Nicholas Frankenreiter was told of Mr. Stewart's failure to pay.

2. Without further investigation or consideration, Officer Frankenreiter decided to engage in an action that he later testified was "one of the  * * * most dangerous things that an officer can do"-- a foot pursuit of Mr. Stewart over his $4.85 cab fare. Officer Frankenreiter was joined on this dangerous foot pursuit by the cab driver.

3. Mr. Stewart, with a head start, and not being encumbered by customary police equipment, out-distanced his pursuers by nearly a block, and was able to reach and enter his fenced apartment yard well before either the cab driver or Officer Frankenreiter arrived.

4. After Mr. Stewart entered his fenced yard, and subsequently, his apartment, Officer Frankenreiter continued pursuit. As he was engaging in these activities, he was in radio contact with dispatch, and other officers were responding.

5. The cab driver reached the fence before Officer Frankenreiter, and found that the gate into the yard was locked. The cab driver was unable to see over the six foot privacy fence without jumping and pulling himself up, and as he did that, he could see Mr. Stewart entering the apartment. As Officer Frankenreiter reached the fence, Mr. Stewart had already entered his apartment.

6. Boulder officers Kirshbaum, Starks, and Perea arrived on the scene as these events were unfolding and joined officer Frankenreiter. Although faced with a locked gate on a fenced yard, and with no lawful basis to conduct a warrantless search or entry, without thought or consideration, officer Perea quickly jumped the fence, and started "clearing" the yard. With his gun drawn he started searching to see if anyone was hiding in the yard. He was soon followed by Officers Kirshbaum, Starks and Frankenreiter, all with weapons either drawn or ready, and with even more officers on the way. All having violated Mr Stewart's right to be secure in his home.

7.     Mr. Stewart's garden apartment had its door a couple steps below the yard level. There were stairs down to a landing by the door, which had glass panes that started half way up the door, over solid panels below. The window, however, had blinds that were mostly drawn making clear vision impossible. To the immediate right of the door, as the officers faced it, was a stone column, and beyond that was a window, that also had blinds drawn. As a result, the officers could not see clearly into the apartment.

8.     After breaking into Mr. Stewart's yard, the Officers proceeded to conduct an illegal search with guns drawn to see if anyone was in the yard. After finding no one, they then turned their attention to the apartment. The officers tried to peer into the apartment through gaps in the blinds or through spaces where the blinds were not completely drawn. This attempt to view into the apartment through drawn blinds also constituted an illegal search of the premises.

9.     At about this point, several things occurred nearly simultaneously. Some movement in the apartment was detected, Officer Vaporis had arrived at the scene and was entering the yard with his gun drawn. Even though Officer Vaporis was there for only one or two seconds, he claimed he saw a gun in the door, and he thought someone said "gun".

10.    Officer Vaporis immediately started shooting through the door, shooting three times, and stopped. He claimed he stopped when the gun disappeared out of the window.

11.    Officer Starks thought he saw a gun that was aiming at and shooting at him, and so he pulled his gun and started firing, first shooting toward the door, but then shifting his aim to fire into the window. Mr. Stewart had no gun and no shots were fired by him.

12.    Officer Frankenreiter was standing by the house, trying to peer down into the apartment through the blinds, and he too started shooting through the blinds when he heard the shots.

13.     The Officers loosed a total of 10 shots, eight of which made it into the apartment, and two of which struck Mr. Stewart.  Two bullets ricocheted off the stone column, resulting in an officer being hit by a piece of resulting shrapnel.

14.     From the time that Officer Frankenreiter began his ill-advised foot pursuit, to the time that dispatch received a report of shots fired and officer down, less than two minutes had elapsed.

15.     After the shooting, the officers left a bleeding Mr. Stewart in his apartment without medical attention while they sought further backup from the Boulder SWAT team.

16.     A SWAT unit arrived, demolished a portion of the fence surrounding Mr. Stewart's home and the front door of the home and forcefully removed Mr. Stewart before rendering medical aid.

17.     As a result of the events of the evening, Mr. Stewart was left injured from two gunshot wounds, and suffered and continues to suffer from post-traumatic stress disorder.

18.     Although his rights were trampled by the Boulder police, he was criminally charged for allegedly threatening the lives of the officers who shot him, all over a $4.85 cab fare.

19.     A forensic reconstruction of the occurrences of that evening show that Mr. Stewart could not have been at the door to his apartment holding a gun when the firing commenced.  He had no gun to hold, although a replica bb gun was found behind the door.  If he was holding a gun to the door when the shooting broke out, he could not have sustained the gunshot wounds that he did – he was shot in the back of the right arm, and the front of the right knee.  Had he been holding a gun to the door as the officers claim, he would have suffered multiple gunshots to the torso.

## II. Jurisdiction and Venue

20. This action arises under the Constitution and laws of the United States and is brought pursuant to U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331, and 28 U.S.C. § 1332, because the claims rise, in part, under federal law, and are between citizens of different states. Jurisdiction over Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. § 1988.

21. Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b)(1) and (2) in that one of the defendants resides in the District of Colorado and a substantial part of the events giving rise to the claim occurred in the District of Colorado.

## III. Parties

22. The Plaintiff, Mr. Cole Stewart, is a citizen of the United States of America and a resident of Kansas. At the time of the incident, Mr. Stewart was a resident of Colorado.

23. The City of Boulder Colorado is a municipality and is responsible for supervision, training, official policies, customs, and actual practices of its agents, the City of Boulder Police Department.

24. At all times relevant to this Complaint, Defendant Officer Nicholas Frankenreiter ("Frankenreiter") was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by Boulder.

25. At all times relevant to this Complaint, Defendant Officer Andrew Kirshbaum ("Kirshbaum") was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by Boulder.

26. At all times relevant to this Complaint, Defendant Officer Erin Starks ("Starks") was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by Boulder.

27. At all times relevant to this Complaint, Defendant Officer Jacob Vaporis ("Vaporis") was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by Boulder.

28. At all times relevant to this Complaint, Defendant Officer Ronald Perea ("Perea") was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by Boulder.

## IV. Factual Allegations

29. In the early morning hours of May 30, 2014, Joshua Worth, a taxi driver employed by Northwest Suburban Taxi picked up Mr. Stewart in the area of 13th and Walnut Streets in Boulder, Colorado.

30. Mr. Stewart asked Worth to take him to the area of 10th and College, also in Boulder, Colorado.

31. At some point during the ride, Mr. Stewart asked to be let out of the cab.

32. Worth became unhappy with the speed at which Mr. Stewart was handling the satisfaction of the fare, and concluded that Mr. Stewart was about to skip out of paying. He thus decided to kidnap Mr. Stewart, and with tires screeching and horn blaring, involuntarily transported Mr. Stewart to a Police Annex building.

33. The Police Annex was located approximately one block east of the cab's location.

34. As Worth approached the Police Annex, he began to honk the cab's horn in an attempt to draw attention from the officers inside.

35. As soon as the car came to a stop, Mr. Stewart exited the cab and began to run westbound on College Street.

36. When Worth reached the Police Annex, Frankenreiter came out of the Annex and spoke to Worth.

37. Worth informed Frankenreiter that Mr. Stewart was refusing to pay.

38. Frankenreiter engaged in a foot pursuit after Mr. Stewart over the missing $4.85.

39. Mr. Stewart continued to run to his apartment at 1090 11th Street and entered his apartment #1.

40. After Mr. Stewart entered his apartment, Defendants Frankenreiter Kirshbaum, Starks, Perea and Vaporis arrived on the scene.

41. The officers entered Mr. Stewart's yard by surmounting a six-foot tall privacy fence and a locked gate.

42. Upon entry into the yard, officers drew their guns and began to peer into Mr. Stewart's residence through openings in the blinds.

43. At some point, one of the officers shouted that he had seen a gun, which triggered three officers to launch a volley of ten gunshots, eight of which went into Mr. Stewart's apartment and two of which struck Mr. Stewart.

44. Mr. Stewart was struck once in the back of his arm, with the bullet exiting through his forearm, and a second time through the front of his knee.

45. Mr. Stewart lay bleeding in his apartment for over two (2) hours while the officers summoned a SWAT team and Bearcat to demolish the privacy fence and front door to Mr. Stewart's apartment.

46. Upon forcefully gaining entry, officers escorted an injured and very confused Mr. Stewart from his apartment, placed him in handcuffs, and left him in the middle of the street until medical assistance arrived.

47. Mr. Stewart was charged with felony menacing with the officers as the purported victims. During the course of the trial, Frankenreiter, testified falsely to various matters. He testified "the only time he looked at me was right as he was exiting the cab as I was coming out the door." Later in his testimony, however, he stated that as he was entering his apartment, he looked at him again. He also testified that he saw Mr. Stewart put a gun up to the window in the door. From no vantage point through the window into which he was looking, could he observe Mr. Stewart put anything up to the door.

48. Kirschbaum testified to various matters falsely. He stated that he saw a gun barrel pointed at him, followed immediately by the flurry of shots. This testimony was false.

49. Starks also testified that he witnessed a gun at the door pointing out the door window, and as he moved, the gun followed him. He also testified that the gun then moved to the left and pointed at Kirshbaum.

50. Officer Vaporis also testified that he witnessed a gun at the door pointing out of the front window and it was pointing directly at him.

51. As a result of the false testimony given by the defendants, and as a result of other errors made at trial, Mr. Stewart was convicted.

52. While appealing his conviction, Mr. Stewart served all of his term of incarceration and most of the probationary period, and paid court ordered restitution.

53. Mr. Stewart's conviction was ultimately overturned by the Court of Appeals.

54. On remand, Mr. Stewart moved to dismiss the case based on a forensic reconstruction and demonstration that showed that it was factually impossible for the events to have transpired as alleged by Boulder police. This reconstruction was completed only after the first trial.

55. The scene reconstruction determined that it was not possible for two of the officers to see the window in which they claim a gun appeared.

56. Further investigation by the Longmont Police Department utilized line trajectory strings to determine that five shots were fired blindly into the apartment via a window, not the door as expressed by officers at trial.

57. Mr. Stewart's case was voluntarily dismissed by the prosecutor and Court on October 30, 2018.

58. Despite being vindicated in the criminal case, Mr. Stewart still experiences lingering effects from the shooting.

59. Mr. Stewart presently is receiving treatment for post-traumatic stress disorder (PTSD) and his treatment is expected to continue indefinitely.

60. The wrongful conviction and prosecution of Mr. Stewart cost him in excess of $1,000.000.00 in attorney's fees and expenses, none of which should ever be incurred.

V.    **Statement of Claims for Relief**

**First Claim for Relief**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment**
**Unlawful Search**
**(Against All Defendants)**

61. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

62. At all relevant times hereto, Defendants were acting under the color of state law in their capacities as a Boulder, Colorado law enforcement officer.

63. At the time when officers illegally entered the curtilage of Mr. Stewart's apartment and subsequently demolished a portion of his fence to force entry, Mr. Stewart had a clearly established constitutional right under the Fourth and Fourteenth Amendment to the United States Constitution to be secure in his person from unreasonable search without probable cause or a valid exigency.

64. After illegally trespassing in the yard and conducting a search of the yard, the officers commenced to engage in window peeping, seeking to search the inside of the apartment through drawn blinds. These searches were illegal.

65. Any reasonable law enforcement officer knew or should have known of Mr. Stewart's clearly established constitutional right to be secure in his home and curtilage at the time of the entry into the yard and the subsequent search. Any invasion of Mr. Stewart's home or curtilage, to be lawful, had to be authorized by an appropriate judicial warrant. No such warrant had been issued.

66. Defendants Frankenreiter, Kirshbaum, Starks, Perea, and Vaporis engaged in a search that was objectively unreasonable in light of the facts and circumstances confronting them, in violation of Mr. Stewart's constitutional rights.

67. The actions of Defendants Frankenreiter Kirshbaum, Starks, Perea, and Vaporis, as described herein, were undertaken intentionally, maliciously, callously, willfully, wantonly, and/or in reckless disregard of Mr. Stewart's protected rights.

68. The acts or omissions of Defendants were in engaged in pursuant to the custom, policy and practice of the City of Boulder, which encourages, condones, tolerates, and ratifies the

excessive use of force by law enforcement officers in the City. Mr. Stewart's interaction with the Boulder Police is simply one of many improper interactions between officers and citizens of Boulder, most frequently college students, that have resulted in the citizen being shot. Mr. Stewart is one of the lucky ones – he survived.

69. The acts or omissions of Defendants caused Mr. Stewart damages in that he subsequently suffered extreme physical and emotional pain during the assault.

## Second Claim for Relief
## 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment
## Excessive Force
## (Against All Defendants)

70. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

71. At all relevant times hereto, Defendants were acting under the color of state law in their capacities as a Boulder, Colorado law enforcement officer.

72. At the time when Mr. Stewart was shot multiple times by Boulder officers, Mr. Stewart had a clearly established constitutional right under the Fourth and Fourteenth Amendment to the United States Constitution to be secure in his person from unreasonable seizure through excessive force.

73. Any reasonable law enforcement officer knew or should have known of Mr. Stewart's clearly established right at the time of the shooting.

74. Defendants Frankenreiter, Starks, and Vaporis engaged in the use of force that was objectively unreasonable in light of the facts and circumstances confronting them, in violation of Mr. Stewart's constitutional rights.

75. The actions of Defendants Frankenreiter, Starks, and Vaporis, as described herein, were undertaken intentionally, maliciously, callously, willfully, wantonly, and/or in reckless disregard of Mr. Stewart's protected rights.

76. Defendants Frankenreiter, Starks, and Vaporis unreasonably used excessive force against Mr. Stewart, resulting in significant injuries.

77. The acts or omissions of Defendants were in engaged in pursuant to the custom, policy and practice of the City of Boulder, which encourages, condones, tolerates, and ratifies the excessive use of force by law enforcement officers in the City.

78. The acts or omissions of Defendants caused Mr. Stewart damages in that he suffered extreme physical and emotional pain during the assault.

**Third Claim for Relief**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment**
**Deliberately Indifferent Policies, Practices, Customs, Training, Supervision and Ratification**
**(Against City of Boulder)**

79. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

80. At all relevant times to this claim, Boulder maintained longstanding policies, customs, and practices, and failed to properly train, supervise, and discipline its officers in a manner amounting to deliberate interference with respect to excessive force by police officers generally.

81. Defendant Boulder's longstanding policies, customs, and practices, and failure to train, supervise, and discipline its officers included failure to train officers on avoiding the reckless and deliberate creation of the need to use force.

82. Defendant Boulder's conduct with respect to these policies, customs, and practices, and failure to properly train, supervise, and discipline its officers was a driving force behind constitutional violations described herein.

83. Defendant Boulder has failed to discipline, train, or supervise Officers Frankenreiter, Kirshbaum, Starks, Perea, and Vaporis concerning the Fourth Amendment and excessive use of force, including deadly force, in the avoidance of reckless and deliberate creation of the need to use force. Such indifference can be seen from the conclusions reached by the defendant Boulder into the actions of the officers surrounding the shooting, that failed to criticize or even comment on the numerous violations of constitutional rights of Mr. Stewart, and the numerous improper actions of the officers.

84. The indifference of the City to problems in its police force and to its lack of proper training can be seen by virtue of the number of incidents involving interactions between Boulder police officers and Boulder citizens which result in the shooting or wrongful detention of harassment of Boulder citizens.

85. The constitutional violations against and harming Mr. Stewart were a foreseeable consequence of Boulder's actions and inactions.

86. Defendant City of Boulder was deliberately indifferent to the constitutional rights of its citizens, knowing that its officers presented a danger to them, by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force, including in the specific principles described above. Boulder could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

87. Defendant City of Boulder's policies, customs, or practices in failing to properly train and supervise its employees were the moving force and proximate cause of the violation to Mr. Stewart's constitutional rights

88. The custom, policy, and practice of the City of Boulder of encouraging, condoning, tolerating, and ratifying the use of excessive force by law enforcement officers in The City, as described herein, were the moving force behind and proximate cause of the violation of Mr. Stewart's constitutional rights.

89. The acts or omissions of Defendant City of Boulder caused Mr. Stewart damages in that he suffered extreme physical and mental pain during the assault.

90. Defendant Boulder's acts or omissions as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused Plaintiffs other damages.

**Fourth Claim for Relief**
**42 U.S.C. § 1983 – Fourth and Fourteenth Amendment**
**Malicious Prosecution**
**(Against City of Boulder)**

91. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

92. As a result of the incidents of May 30, 2014, Mr. Stewart was charged with felony menacing.

93. Although Mr. Stewart was initially convicted at trial, his conviction was overturned on appeal due to the "questionable footing of the propriety of giving chase to a person who committed a petty offense" and "numerous preserved errors committed during trial." *See People v. Stewart*, 2017 COA 99, P42-P43, 417 P.3d 882, 890 (2017) opinion attached hereto as **Exhibit A**.

94. Mr. Stewart's charges were subsequently dismissed by the prosecution.

95. The City of Boulder pursued the charges against Mr. Stewart when they were unsupported by probable cause, and in light of multiple violations of Mr. Stewart's Fourth Amendment rights against unreasonable search or seizure. The Officers of the City of Boulder offered testimony that was untrue as to the events that led to Mr. Stewarts shooting, and the prosecution was based upon this false testimony.

96. The City of Boulder acted with malice in prosecuting the case against Mr. Stewart in a brazen attempt to suppress or deter action against police wrongdoing.

97. As a result of the criminal prosecution, Mr. Stewart sustained damages in excess of $1,000,000.00 for legal fees and other expenses in defending himself against the baseless prosecution, including a full trial and appeals process.

## Fifth Claim for Relief
## 42 U.S.C. § 1983 – Fourth and Fourteenth Amendment
## Violation of due process
## (Against City of Boulder)

98. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

99. As a result of the incidents of May 30, 2014, Mr. Stewart was charged with felony menacing.

100. In order to obtain a conviction of Mr. Stewart, and to cover up for inappropriate police work, officers Frankenreiter, Starks, Vaporis, and Kirshbaum of the City of Boulder offered false testimony as to how the events unfolded. As shown by the reconstruction of the events, although four officers testified that they saw Mr. Stewart at the door with a gun when the barrage of gunfire erupted, Mr. Stewart could not have been at the door with the gun or he would

have been riddled with bullets.  Instead, the wounds that he received show that he was approximately four feet away from the door when the first shots were fired.

101. By offering false testimony the Officers of the City of Boulder violated Mr. Stewart's rights to due process secured by the Fourth and Fourteenth Amendments to the United States Constitution.

102. By basing the charge and prosecution of the crime of "menacing" on this false testimony, the City of Boulder violated Mr. Stewrt's rights to due process secured by the Fourth and Fourteenth Amendments to the United States Constitution.

103. As a result of the this violation of Mr. Stewart's rights, he sustained damages in excess of $1,000,000.00 for legal fees and other expenses in defending himself against the baseless prosecution, including a full trial and appeals process.

**Sixth Cause of Action**
**State Common Law**
**Malicious Prosecution**
**(Against City of Boulder)**

104. Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

105. Mr. Stewart was charged with felony menacing after the events of May 30, 2014.

106. Mr. Stewart's conviction was overturned on appeal due to the "questionable footing of the propriety of giving chase to a person who committed a petty offense" and "numerous preserved errors committed during trial." *See People v. Stewart*, 2017 COA 99, P42-P43, 417 P.3d 882, 890 (2017) opinion attached hereto as Exhibit A.

107. On remand, charges were subsequently dismissed by the prosecution.

108. These charges were pursued despite being unsupported by probable cause, and in light of multiple violations of Mr. Stewart's Fourth Amendment rights against unreasonable search or seizure.

109. The City of Boulder acted with malice in prosecuting the case against Mr. Stewart in a brazen attempt to suppress or deter action against police wrongdoing, and based that prosecution on false testimony officered by Officers of the City of Boulder.

110. As a result of the criminal prosecution, Mr. Stewart sustained damages in excess of $1,000,000.00 for legal fees and other expenses in defending himself against the baseless prosecution, including a full trial and appeals process.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in their favor against each of the Defendants, and award Plaintiff all relief allowed by law, including but not limited to the following:

a. Any and all appropriate relief at law and in equity;

b. Declaratory relief and other appropriate equitable relief;

c. Economic losses on all claims as allowed by law;

d. Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

e. Punitive damages on all claims allowed by law in an amount to be determined at trial;

f. Attorney's fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

g. Pre- and post-judgment interest at the appropriate lawful rate; and

   h. Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this  3rd day of June, 2019.

Attorneys for Plaintiff:

*/s/ R. Jake Johnson* #42058
Digitally signed for

R. Jake Johnson, Esq (CO Bar. No. 42058)
POLLART MILLER LLC.
5700 S. Quebec St.
Suite 200
Greenwood Village, CO 80111
Phone: 720-488-9586
Fax: 720-488-9587
jjohnson@pollartmiller.com

Of Counsel:

Robert W. Coykendall  Kan. Bar No. 10137
Grant A. Brazill Kan. Bar. No. 26809
MORRIS, LAING, EVANS, BROCK &
   KENNEDY, CHTD.
300 N. Mead
Suite 200
Wichita, KS  67202
Phone:  316-262-2671
Fax: 316-262-6226
rcoykendall@morrislaing.com; gbrazill@morrislaing.com

Roger N. Walter  Kan. Bar. No. 08620
Trevor C. Wohlford  Kan. Bar. No. 19443
MORRIS, LAING, EVANS, BROCK &
   KENNEDY, CHTD.
800 S.W. Jackson
Suite 1310
Topeka  KS  66612-1216
Phone:  785-2332-2662
Fax:  785-232-9983
rwalter@morrislaing.com; twohlford@morrislaing.com